Porter, J.
delivered the opinion of the court. This case comes again before us on an appeal taken by the defendants. We have already twice remanded it on their prayer, 11 Martin, 202 and 630, and they ask us to do so again. The questions, which the record now present, grow out of decisions of the judge of the first instance, refusing to admit certain witnesses to testify, who were offered by the appellants.
The first was Carlile Pollock, the notary who drew the bill of sale of the schooner: he was presented to prove certain declarations of Brown the captain, in order to show that he, and not Nicholson, was the owner.
The second was Nicholson, the purchaser mentioned in the bill of sale. He was offered to prove, that the true intent and purpose of the bill of sale, by which he acquired the vessel, was to secure him as endorser of a promissory note; and that Brown, who sailed as captain, and was stated to be such in the policy of insurance, was in fact the true owner.
*494 I. We think the district judge did not err in rejecting the proof offered of Brown’s declarations. There was no privity between him and the plaintiff. The latter neither claimed under nor through him; and if his statements can be given in evidence, it must be on a principle which would admit those of any other stranger.
But it appears to the court that there are solid objections against receiving such proof. Testimony, when it can be had on oath, is so much more entitled to consideration, than that which is given without its sanction; that the law never permits any other but from necessity—a necessity not founded upon a want of any other or better proof, in the particular case, as was contended for by counsel; for that argument would cut up by the root, all the rules of evidence; but, because the injury done to society, by rejecting hearsay testimony, in cases of pedigree, filiation, ancient boundaries, &c., would be greater than that which can result from its admission. In the case now under consideration, the question whether Brown or Nicholson was owner, does not certainly come within any of the exceptions heretofore established, as authorizing a *495 deviation from the general rule; and if we had the power to augment them, which we disclaim, we should hesitate before we added to them a simple case of contract, which is of recent occurrence, and susceptible of higher and better proof. That higher and better proof would have been the testimony of the person whose statements the appellants offered to prove by another witness. Brown himself could have given the best evidence, of which the case is susceptible.
Nor does the testimony, here offered, come within the principle which receives in evidence the declarations of the parties when they form a part of the res gestœ. For the witness was not a party to the public act, sought to be controlled by parol evidence, and the assertions of any other man in the community might as well be introduced to prove title in himself. This opinion is formed on the bill of exceptions, found in the record, which presents the question alone, whether Brown’s declarations were evidence. If there were any particular circumstances which would have authorized their being proved, it was the duty of the party excepting, to have stated them. Acts of 1813, 202, sect. 17. Shewell vs. Stone, *496 ante, 386. We do not say that an assertion of right to the property on the part of Brown, in the presence of Nicholson, might not be taken as an acknowlegment of the person holding title. It might then perhaps be received, not because the one asserted his claim, but because the other acquiesced in it.
II. The question as to the admissibility of Nicholson, has been already settled by the former decisions of the court, and his competence is a necessary result of the doctrine contained in the opinion delivered when this case was last before us, 11 Martin, 630, and that expressed in Millaudon vs. Louisiana Insurance Company, ibid 602. As we understand the Law Merchant, which prevails in this state, insurers may lawfully take on themselves the risk of barratry, on the part of the captain and mariners; and that if they do so, they have no recourse against the owners, because they are paid for the responsibility they incur. Hence, on a question arising between those who freight goods on board a vessel and the insurers, the reputed or apparent owner is a good witness: he stands quite indifferent between the parties; for whether he establishes the person who sailed as captain, to be proprie *497 tor or not, the result to him must be the same. If the freighters recover, he is not responsible, as the assurers warranted that the captain would not commit barratry. Should, on the contrary, the assured fail in their action, because the master was owner, then he has clearly no interest whatever in the transaction.
It has been contended, however, that the definition given by the court of barratry, is an erroneous one, and that we should adopt that which prevails on the continent of Europe.—Before entering on the consideration of the reasons which have been urged to us in support of this position, we think proper to remark, that if any law had been produced from that country whose legislation, where it has not been altered by that of our own, is still the rule of action in this state, we should readily adopt, and strictly obey it. None such has been produced to us; our own researches have been equally unsuccessful in furnishing us with any, and we must therefore look elsewhere for a guide.
To what laws the legislature referred, when in the Civil Code (260 art. 7) they declared, that the rules peculiar to commercial transactions, were established by the laws relating *498 to commerce, has often been a subject of inquiry and discussion, which as yet has not received a satisfactory explanation; and which, until a further and more explicit declaration of their will, is perhaps not susceptible of any. Courts, however, cannot wait until the law is made clear; they must decide cases when they are presented, and in the absence of positive regulation which eases their labour,and diminishes their responsibility, they must resort to general principles; and drawing them from sources which they believe pure and sound, apply them in such a manner as will do justice between the parties, and in cases of this kind best promote the growth and extension of that commerce, which enriches our country and adorns it.
In commercial questions there is less difficulty in deciding, in the absence of statutory provisions, than any other which are presented. The lex mercatoria is nothing more than the usages and customs of trade, which the courts of justice in different countries have, from time to time, applied to cases before them, and which, in some states, have been reduced into codes and promulgated by legislative authority. The justly celebrated *499 ordinance of marine, of Louis xiv., we are informed by the commentators on it, was drawn from the usages and customs previously existing in Europe. Valin, vol. 1, 6 pref. Emerigon, v. 1, pref. 15. The consulato del mare was nothing more than a collection of the usages prevailing at the time it was compiled. Consulat de la mer, par Bourcher, vol. 1, 45; and Blackstone tells us, that the affairs of commerce are regulated by the law merchant, which all nations take notice of, 1 Comm., 273. For the decision of this case, then, it is only necessary to ascertain, what is the law merchant of this state on the subject before us; and we are of opinion that, from the close and intimate connexion which exists between this port and those of the other cities in the union, from the circumstance that nearly all the vessels by which the trade of this place is carried on, belong to our sister states; and that the contract of assurance is principally entered into by their owners or their freighters, (purchasers of our produce, who are most generally from other parts of the union,) that the contract of assurance is understood here as it is in the other maritime cities of the United States. If there is error in this view of the subject, the *500 remedy must be sought with those in whom the constitution has vested legislative authority. But it is not the first time that this tribunal has recognised the law merchant which prevails here, and given force to it.—Baker vs. Montgomery & als. 4 Martin, 92. Pouts vs. Duplaulier, 2 Martin, 328. 7 id. 462.
Were we to have recourse to the commercial usages of the continent of Europe, we should have great difficulty indeed, in ascertaining which to adopt; or whether, in truth, barratry could be insured against. In France, previous to the ordinance of Louis the 14th, insurers were responsible ipso facto for barratry. By the terms of that law, they were only made so when the offence was expressly mentioned in the policy. According to an ordinance of Phillip the 2d of Spain, made to regulate the commerce of the city of Antwerp, it is forbidden to insert the clause of warranty of good conduct in captain and mariners, under the penalty of nullity. The same usage prevails at Rotterdam, and at Cadiz. While, on the other hand, we find, that by the ordinance of Bilboa, barratry of the master and crew may be insured against. Such is also the custom of Hamburgh and Genoa, with *501 the exception, that at the last mentioned place, it is limited to acts not fraudulent. Emerigon gives us a list of several writers who entertain directly opposite opinions on this point, and they seem pretty equal in number and authority. Amidst such contradiction and confusion, which of these systems is this court to adopt? We think, none of them; and that the safest rule to follow is, that which is understood, and acted on, by the merchants and underwriters in this and other states of the union. Emerigon, traité des assurances, vol. 1, ch. 12, sect. 3, 366. Valin, Commentaire sur l'ordonnance de la marine, vol. 2. lib. 3. tit. 6, art. 28, des assurances. Ordonansas de Bilboa, cap. 22, n. 19. Febrero addicionado, 1 appendix ad cap. 10, § 5.
If we should even accede to the definition of barratry given by the counsel for the plaintiff, we do not believe the witness offered was incompetent, or that he was swearing away his liability, by proving the captain to be proprietor. Emerigon was principally relied on in support of this idea, and that passage was cited, where he states, that the owner of a ship cannot insure against the acts of the master; because, by a provision of the civil *502 law, omnia facta magistri debet prœstare, qui eum proposuit. On which we would remark, that this opinion is in direct opposition to the express letter of the ordinance, art. 28, which declares, that insurers are not liable for injuries resulting from the fraud of the captain, si par la police ils ne sont chargés de la baraterie de patron. Valin, in his commentary on this article, doubts, or rather denies, the application of these expressions just cited from the Roman law, to the contract of assurance, and makes no exception to the right of the owner, to be insured, except when he commands the vessel himself. Emerigon too, in the subsequent part of that section, quoted by counsel, observes, that if the underwriters expressly mention that they warrant the good conduct of the captain, they will be responsible. This reduces the question to an inquiry into the meaning of the words used in the policy; and we all think, that an engagement to answer for the bad conduct of an agent, is as strong as a warranty that his conduct should be good.
Whichever way we consider the subject, therefore, whether according to the definition we give of barratry, or that insisted on by plaintiff, the witness should have been permitted to testify.
Livermore for the plaintiff, Duncan for the defendants.
It is therefore ordered, adjudged and decreed, that the judgment be annulled, avoided and reversed, and that this cause be remanded for a new trial, with directions to the district judge not to reject Nicholson as a witness; and it is further ordered, adjudged and decreed, that the appellee pay the costs of this appeal.